UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

JOHN J. BUMGARDNER,                          )
                                             )
                  Plaintiff,                 )
                                             )
        v.                                   )        No. 3:17-cv-00081-RLY-MPB
                                             )
NANCY BERRYHILL, Acting Commissioner         )
of the Social Security Administration,       )
                                             )
                  Defendant.                 )

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff John Bumgardner applied for disability insurance benefits from the Social

Security Administration ("SSA") on January 22, 2014, alleging an onset date of October

24, 2013. [Filing No. 8-5 at 2.] His application was initially denied on May 28, 2014,

[Filing No. 8-4 at 4], and upon reconsideration on August 19, 2014, [Filing No. 8-4 at 14].

The Administrative Law Judge (the "ALJ") held a hearing on February 18, 2016. [Filing

No. 8-2 at 37-72.] The ALJ issued a decision on April 29, 2016, concluding that Mr.

Bumgardner was not entitled to receive disability insurance benefits. [Filing No. 8-2 at

11.] The Appeals Council denied review on April 21, 2017. [Filing No. 8-2 at 2.] On May

12, 2017, Mr. Bumgardner timely filed this civil action, asking the court to review the

denial of benefits pursuant to 42 U.S.C. § 405(g). [Filing No. 1.]

**I.**
**STANDARD OF REVIEW**

"The Social Security Act authorizes payment of disability insurance benefits … to

individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The

statutory definition of 'disability' has two parts. First, it requires a certain kind of inability, namely, an inability to engage in any substantial gainful activity. Second, it requires an impairment, namely, a physical or mental impairment, which provides reason for the inability. The statute adds that the impairment must be one that has lasted or can be expected to last … not less than 12 months." *Id.* at 217.

When an applicant appeals an adverse benefits decision, this court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this court must afford the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform [his] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citations omitted) (alterations in original). "If a claimant satisfies steps one, two, and three, [he] will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then [he] must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id*. The ALJ uses the RFC at Step Four to determine whether the claimant can perform [his] own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. [*See* 20 C.F.R. § 404.1520(iv), (v).] The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the court must affirm the denial of benefits. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id*. (citation omitted).

## II.
### BACKGROUND

Mr. Bumgardner was 39 years old at the time he applied for disability insurance benefits.  [Filing No. 8-5 at 2.]  He has completed high school.  [Filing No. 8-2 at 28.][1]

The ALJ followed the five-step sequential evaluation set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a)(4) and ultimately concluded that Mr. Bumgardner is not disabled.  [Filing No. 8-2 at 29.]  The ALJ found as follows:

- At Step One, the ALJ found that Mr. Bumgardner has not engaged in substantial gainful activity[2] since October 24, 2013, the alleged onset date.  [Filing No. 8-2 at 16.]

- At Step Two, the ALJ found that Mr. Bumgardner has the following severe impairments: Wegener's granulomatosis/vasculitis, anemia, pulmonary hypertension, degenerative joint disease/osteoarthritis, obesity, hypertension, stage III chronic kidney disease, deep venous thrombosis of the left lower extremity, pericarditis, neuropathy, depressive disorder (not otherwise specified), and anxiety disorder (not otherwise specified).  [Filing No. 8-2 at 16.]

- At Step Three, the ALJ found that Mr. Bumgardner does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  [Filing No. 8-2 at 18.]

- After Step Three but before Step Four, the ALJ found that Mr. Bumgardner has the RFC to "perform sedentary work as defined in 20 CFR 404.1567(a) except he could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; sit for at least six hours in an eight-hour period and stand and/or walk for about two hours in an eight-hour period.  He needs to be permitted to utilize a cane when ambulating within the workplace and can never climb ladders, ropes, or scaffolds.  The claimant

---

[1] Both parties provided a detailed description of Mr. Bumgardner's medical history and treatment in their briefs.  [Filing No. 12; Filing No. 18.]  Because that discussion implicates sensitive and otherwise confidential medical information concerning Mr. Bumgardner, the court will simply incorporate those facts by reference and only detail specific facts as necessary to address the parties' arguments.

[2] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

could occasionally climb ramps and stairs with a handrail and also occasionally balance, stoop, kneel, crouch, and crawl. The claimant could frequently but not constantly use his bilateral upper extremities for handling, fine fingering, feeling, pushing/pulling, and operating hand controls. He could occasionally use the bilateral upper extremities for overhead reaching. The claimant could occasionally use his left lower extremity for pushing/pulling and operating foot controls. He should avoid even moderate exposure to dangerous workplace hazards such as exposed moving machinery and unprotected heights, vibration, and wetness due to a history of foot drop and fatigue. The claimant should avoid concentrated exposure to fumes, dusts, odors, gases, areas of poor ventilation, temperature extremes of heat and cold, and humidity. The claimant could understand and remember simple instructions and carry out simple, routine tasks that require little independent judgment or decision-making, completed in two-hour segments at a time with a short 10-15 minute rest break between two-hour segments. The claimant can have no more than occasional public interaction." [Filing No. 8-2 at 22.]

- At Step Four, the ALJ concluded that Mr. Bumgardner is unable to perform any past relevant work. [Filing No. 8-2 at 28.]

- At Step Five, the ALJ found that considering Mr. Bumgardner's age, education, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. Bumgardner could perform as a sorter, weight tester and inspector. [Filing No. 8-2 at 28-29.]

### III.
### DISCUSSION

Mr. Bumgardner makes two broad assertions of error regarding the ALJ's decision, with many sub-issues included, each of which the court will consider in turn.

### A. Whether the ALJ Failed to Properly Assess Multiple Impairment Listings

### 1. Listing 4.11

Mr. Bumgardner initially argues that the ALJ performed a perfunctory analysis of listing 4.11 of the listed impairments at 20 C.F.R. Pt. 404, Subp. P, App 1. [Filing No. 12 at 7 (citing *Minnick v. Colvin,* 775 F.3d 929, 935 (7th Cir. 2015)).] Mr. Bumgardner asserts the analysis is "problematic because there are numerous references to edema throughout

[Mr.] Bumgardner's medical records which *may* give rise to a finding of [disability] under [the listing]." [Filing No. 12 at 8 (emphasis added).] Mr. Bumgardner notes "[w]hile it is true that none of the medical records specifically note *brawny* edema, at least one record noted the presence of pitting edema." [Filing No. 12 at 8 (emphasis in original) (citing Filing No. 8-21 at 71).] Mr. Bumgardner further asserts that "[a]t the very least, it was incumbent upon the ALJ to further develop the record to determine the presence of edema by simple questions about how [Mr.] Bumgardner's edema presented itself and his symptoms." [Filing No. 12 at 8 (citing *Shauger v. Astrue*, 675 F.3d 690, 698 (7th Cir. 2012)).]

The Commissioner argues generally that the ALJ's Step Three finding is supported by substantial evidence and in particular with regard to listing 4.11 that Mr. Bumgardner has the burden of proof to show that his chronic venous insufficiency included one of the following:

> a. Extensive brawny edema (*see* 4.00G3) involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip; OR
>
> b. Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

[Filing No. 18 at 7-8 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1).] The Commissioner concludes that the ALJ determined that Mr. Bumgardner did not satisfy the listing because he could not demonstrate the above criteria. [Filing No. 18 at 8.] The Commissioner further points out that the regulations explain that pitting edema does not satisfy the listing. [Filing No. 18 at 9.]

In order to meet or equal an impairment identified in the listings, a claimant must establish, with objective medical evidence, all of the criteria specified in the listing. *See* 20 C.F.R. §§ 404.1525, 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of" benefits at Step Three).

For starters, Mr. Bumgardner does not supply the criteria specified in the listing, let alone attempt to demonstrate for the court how the evidence establishes all of the criteria[3]. By referencing medical evidence showing edema, the court assumes that he meant to assert that the record demonstrates "a. Extensive brawny edema (*see* 4.00G3) involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip." However, the court finds the argument unavailing. The listing contemplates not just edema, but edema of a specific type (brawny edema), severity (extensive), and location (described above). Mr. Bumgardner admits that none of the evidence shows brawny edema. He attempts to excuse that failure by citing one reference to pitting edema. However, the regulations define "*What is brawny edema?* […] It is not the same thing as pitting edema. Brawny edema generally does not pit (indent on pressure), and the terms are not interchangeable. Pitting edema does not satisfy the requirements of 4.11A." [20 C.F.R. Pt. 404, Subpt. P, App. 1, 400(G)(3).] Moreover, the other evidence he cites shows edema at varying levels from trace to plus two, while the

---

[3] Mr. Bumgardner actually never even positively asserts that the listing is in fact met by the evidence. [Filing No. 12 at 7-8.] However, the court will reach his argument about the sufficiency of the ALJ's given explanation that the listing was not met.

listing demands the brawny edema to be extensive in the specified location. The court does not find the listing criteria to be met by Mr. Bumgardner's presented evidence or any other evidence of record and concludes that the ALJ's finding is supported by substantial evidence[4].

## 2. Listing 1.02

Mr. Bumgardner next argues that the ALJ "rejected any substantive analysis" regarding listing 1.02. [Filing No. 12 at 8.] However, once again Mr. Bumgardner fails to articulate the criteria required by the listing or demonstrate for the court how the listing is met by the evidence, focusing rather on the sufficiency of the explanation given by the ALJ and making arguments about the ALJ's analysis of one aspect of the listing (the inability to ambulate effectively), Mr. Bumgardner's credibility, and his subjective complaints of pain. [Filing No. 12 at 8-11.]

However, the court starts with the governing standard. The ALJ noted the requirements of the listing:

---

[4] Mr. Bumgardner cites *Minnick*. However, the Court there found an ALJ's analysis to be inadequate where there was actual evidence of record to support the listing asserted, which is notably lacking here. *See Minnick*, 775 F.3d at 935-36 (*See also Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012) (remanding where the ALJ's cursory Listing analysis failed to articulate rationale for denying benefits when record supported finding in claimant's favor)). Mr. Bumgardner's reliance on *Shauger* is also distinguishable. That Court found that the ALJ had an obligation to develop expert testimony that was in conflict with other substantial evidence of record and went beyond the bounds of a medical opinion to assess the claimant's credibility. *Shauger*, 675 F.3d at 698. Here, Mr. Bumgardner did not assert the listing was met at the hearing and the record fails to support that the listing is actually met. This court is not persuaded that the ALJ had any obligation to develop testimony further in this instance where no conflict was apparent.

> Section 1.02 of the Listing of Impairments is satisfied when an individual has a major dysfunction of a joint(s) characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint with *either involvement of one major peripheral weight-bearing joint* resulting in the inability to ambulate effectively *or involvement of one major peripheral joint in each upper extremity*, resulting in the inability to perform fine and gross movements effectively.

[Filing No. 8-2 at 18-19 (emphasis added)]. The regulations further define involvement of one major peripheral weight-bearing joint to be specifically limited to "(*i.e.,* hip, knee, or ankle)", [20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02(A)], with the foot or toes notably absent, compared with the definition of involvement of one major peripheral joint in each upper extremity which includes "(*i.e.,* shoulder, elbow, or *wrist-hand*)", [20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02(B) (emphasis added)].

The court acknowledges that the ALJ's analysis of the listing is rather brief and appears to focus on the severity of the joints effected. However, the court is satisfied that the ALJ's brief explanation and supporting evidence cited is adequate to support his conclusion that the listing is not met. The ALJ notes with regard to the objective imaging that "x-rays of the left shoulder performed on September 23, 2013, showed only mild degenerative change of the acromioclavicular joint (Exhibit 14F/38). The claimant also complained of right foot pain. However, x-rays of the right foot performed on November 20, 2013, showed only mild degenerative change in the AP joint over the great toe (Exhibit 14F/39)." [Filing No. 8-2 at 19 (citing Filing No. 8-23 at 39 (x-ray of only the left shoulder showing "no acute abnormality") and Filing No. 8-23 at 40 (x-ray of right foot showing

only mild degenerative change in "the great toe. Elsewhere no bone or joint abnormality is seen to explain foot pain")).] Without reaching whether the "mild" degenerative changes falls short of the requirements of the listing, the court notes that the imaging does not establish the diagnostic criteria in each of the required joints. The acceptable imaging does not establish an impairment in a major peripheral weight-bearing joint, limited to one joint in the great toe, which is not a joint listed as satisfying the listing. The imaging further does not establish impairment of a peripheral joint in *each* upper extremity, limited solely to the left shoulder. Mr. Bumgardner does not provide supporting evidence of record that would establish impairment in the specifically required joints by acceptable imaging either. Accordingly, the court finds that substantial evidence supports a finding that the listing is not met and the ALJ's brief explanation citing to the available imaging which fails to meet the listing is adequate.

### 3. Listing 11.14

Mr. Bumgardner does not expressly argue separately that listing 11.14 is met. However, in his argument with regard to listing 1.02, he notes that the ALJ analyzed his inability to ambulate effectively, one of the requirements of each listing that is shared, and concludes that the ALJ's "analysis is erroneous for two reasons", [Filing No. 12 at 10], and that the evidence supports that "[a]ll of these impairments limit his ability to ambulate effectively and support a finding that [Mr.] Bumgardner is disabled under Impairment Listing 1.02, as well as under Impairment Listing 11.14 as applicable at the time of the decision," [Filing No. 12 at 11]. The court will reach Mr. Bumgardner's argument.

First, Mr. Bumgardner suggests that opinion evidence supports that he is unable to ambulate effectively. [Filing No. 12 at 10.] He notes that his "primary care physician, Dr. Wessel, noted that [Mr.] Bumgarder could not ambulate effectively." [Filing No. 12 at 10 (citing Filing No. 8-26 at 20).] However, Mr. Bumgardner mischaracterizes the evidence he cites. On November 7, 2013, Dr. Wessel did make examination findings that included reference to Mr. Bumgardner's gait as "slowed and almost with dragging foot type gait." [Filing No. 8-26 at 20.] However, the inability to ambulate effectively is a legal conclusion with a specific definition of which Ms. Bumgardner is obviously aware considering his next assignment of error below. An examination finding that there was disturbance of gait is not really a medical opinion at all and even if it were construed liberally to be a medical opinion there is nothing in the cited exhibit to suggest that Dr. Wessel was making a conclusion about Mr. Bumgardner's inability to ambulate effectively as that is defined in the regulations (or is even aware of the regulatory definition).[5] Similarly, Mr. Bumgardner cites to examination findings of Dr. Denton. [Filing No. 12 at 10 (citing Filing No. 8-28 at 18).] The court is not really clear what the cited evidence is supposed to demonstrate. At most, it shows that there is some evidence supporting that Dr. Denton would have issues with ambulation.

---

[5] Mr. Bumgardner repeatedly confuses examination findings and medical opinions throughout his brief, which frustrates the court's legal analysis and will be discussed later as it pertains to the ALJ's treatment of opinion evidence.

Second, Mr. Bumgardner asserts that the ALJ applied a more narrow definition of the inability to ambulate effectively than is specified in the regulations. [Filing No. 12 at 10.] Mr. Bumgardner notes the definition:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. . .Therefore, examples of ineffective ambulation include, *but are not limited to*, the inability to walk without the use of a walker, two crutches or two canes, *the inability to walk a block at a reasonable pace on rough or uneven surfaces*, the inability to use standard public transportation, *the inability to carry out routine ambulatory activities, such as shopping and banking*, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

[Filing No. 12 at 10-11 (citing 20 C.F.R. Pt. 404, Subpt. P. App. 1, 1.00(B)(2)(b)(2) (emphasis in original)).]

However, the court can find no error of law as to the definition the ALJ applied. Mr. Bumgardner seems to be suggesting that the ALJ found it determinative that Mr. Bumgardner used only a single cane, rather than a walker, two crutches or two canes. However, the court does not agree. The ALJ noted Mr. Bumgardner's alleged problems with ambulation and the ALJ acknowledged evidence that Mr. Bumgardner needed a cane to ambulate. [Filing No. 8-2 at 20.] However, the ALJ noted Mr. Bumgardner's own Functional Report statement that he could walk 100 yards before needing to rest for 15 minutes. [Filing No. 8-2 at 20 (citing Filing No. 8-6 at 32 (completed by Mr. Bumgardner's wife on his behalf on April 10, 2014))].[6] The ALJ further supported his finding that Mr.

---

[6] Mr. Bumgardner argues that the ALJ's "attempt to support his case" with this statement is contradicted by his testimony at the hearing establishing that his condition "severely

Bumgardner had not demonstrated with the medical evidence of record the inability to ambulate effectively with the following:

> Dr. Ryon noted the claimant ambulated with a cane when he examined him on June 17, 2014. However, he did note the claimant was ambulating and that he only required a single cane in order to do so (Exhibit 16F/3-5). In January 2015, the claimant reported to Ms. Funderburk that he would walk for a while. In addition, Ms. Funderburk noted the claimant did not have gait abnormality (Exhibit 20F/3-5). In October 2015, Dr. Tapal noted that the claimant's hips, knees, ankles moved normally (Exhibit 22F/34-35). Finally, when Dr. Evanson saw the claimant in December 2015, he observed that the claimant had a normal gait and station (Exhibit 24F/4-6).

[Filing No. 8-2 at 20.] The ALJ noted that only one cane was used, but did not rely entirely on that fact alone, which is clearly relevant under the regulations specifying the need to use an assistive device in both hands under the examples of the definition. The ALJ also cited to examination findings of normal gait and station which were some of the most recent evidence of record at the time of the decision. He also noted that Mr. Bumgardner himself described the ability to walk 100 yards before needing to rest for 15 minutes. Consideration of all of this evidence is not at all in conflict with the definition provided in the regulations.

Furthermore, the court finds the ALJ's conclusion that the record does not demonstrate the inability to ambulate effectively is supported by substantial evidence. At the most, Mr. Bumgardner has demonstrated that there is conflicting evidence of record as to the finding. To determine whether substantial evidence exists, the court reviews the record as a whole but is not allowed to substitute its judgment for the ALJ's "by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding

---

deteriorated since that date." [Filing No. 12 at 9-10.] However, the ALJ did not find Mr. Bumgardner fully credible.

questions of credibility." *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999) (internal quotations omitted). Because Mr. Bumgardner must prove all of the criteria of the listing, the court finds the ALJ's finding to be determinative here that the listing is not met.

### 4. Mr. Bumgardner's Credibility

Mr. Bumgardner does not fully develop an argument that the ALJ's credibility finding was not supported. He does assert that the ALJ improperly discredited his testimony concerning subjective complaints of pain under his listing 1.02 argument. [Filing No. 12 at 9.] Mr. Bumgardner also asserts that the ALJ committed legal error in that "he did not make any specific findings as to why [Mr. Bumgardner], an individual with a strong history, was not credible or should be given more weight" requiring reversal and remand. [Filing No. 12 at 9 (citing *Stark v. Colvin,* 813 F.3d 684, 689 (7th Cir. 2016)).] To the extent the issues are raised and implicate the ALJ's credibility finding generally, the court will consider whether the ALJ's finding includes an error of law or is otherwise unsupported by substantial evidence.

First, the court does not find reversible error simply because the ALJ did not mention Mr. Bumgardner's work history. In *Stark,* the Court noted:

> An ALJ is not statutorily required to consider a claimant's work history, but "a 'claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.'" *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)). In assessing Stark's credibility about the disabling effects of her pain, the ALJ should have acknowledged Stark's efforts to continue work while experiencing significant pain and undergoing numerous

surgeries and other treatments to relieve it. *See Pierce*, 739 F.3d at 1051 (criticizing ALJ for failing to consider claimant's "dogged efforts" to work in deciding claimant's credibility); *Flores v. Massanari*, 19 F. App'x 393, 404 (7th Cir. 2001) (criticizing ALJ for failing to acknowledge claimant's solid work history of 13 years).

*Stark*, 813 F.3d at 689. Mr. Bumgardner does not present any evidence to support that his case is similar to the one in *Stark* and the related cases above where the Court was impressed with a long work history after the onset of his impairments and a resilience to remain working. Furthermore, the court reads the decisions above to find the absence of a discussion into the claimant's work history to be one factor in assessing the ALJ's credibility analysis. One of the Court's later decisions makes that clear:

> The ALJ did not commit reversible error by failing to explicitly discuss Summers's work history when evaluating her credibility. See *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) ("An ALJ is not statutorily required to consider a claimant's work history[.]"). Although a consistent work history weighs in favor of a positive credibility finding, it is still just "one factor among many, and it is not dispositive." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016).

*Summers v. Berryhill,* 864 F.3d 523, 528-29 (7th Cir. 2017). The court does not find reversible error here simply because the ALJ did not mention Mr. Bumgardner's work history.

The court further finds that the ALJ's credibility finding is supported by substantial evidence. The court will only overturn the ALJ's credibility determination if it is patently wrong, which means that the decision lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). In drawing his conclusions, the ALJ must "explain [his] decision in such a way that allows us to determine whether [he] reached [his] decision

in a rational manner, logically based on [his] specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). Mr. Bumgardner provides limited argument that the ALJ's finding is patently wrong beyond what is noted above and his criticism of portions of the decision that appear to be boilerplate. However, the court finds that ALJ supported his findings with a fairly extensive review of each of Mr. Bumgardner's allegations, including the degree to which they were supported by objective evidence, observations of treating providers, his response to treatment, and activities of daily living. [Filing No. 8-2 at 24-26.] Accordingly, the court declines to disturb the ALJ's credibility finding under the deferential standard.

### B. Whether the ALJ's Decision Failed to Include Substantive Functional Limitations Supported by the Record

Mr. Bumgardner further makes a broad argument that the ALJ's decision failed to incorporate substantive functional limitations. [Filing No. 12 at 11.] Mr. Bumgardner throws an array of related arguments at the court with no particular organization. The court will attempt to reach them below. However, the court does not find that any of the alleged errors support reversal and remand.

In particular, Mr. Bumgardner fails to articulate specific functional limitations that were ignored. For example, he begins by citing evidence that the record is "replete with the fact that [Mr.] Bumgardner has bilateral foot drop and weakness," that the decision does not account for his inability to ambulate effectively, that Dr. Ryon noted he required the use of the cane, and Dr. Wessel noted a disturbed gate on exam. [Filing No. 12 at 11.] Mr. Bumgardner argues that an "ALJ cannot simply ignore evidence that does not support

his or her ultimate conclusion." [Filing No. 12 at 11 (citing *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016)).] The ALJ repeatedly referenced issues with ambulation in the decision, noted evidence of drop foot, [Filing No. 8-2 at 26], and more importantly limited Mr. Bumgardner to standing and walking of no more than two hours in an eight hour day and the need to use a cane to ambulate within the workplace in his RFC finding, [Filing No. 8-2 at 22.] The ALJ did not give full weight to an opinion of record from Dr. Sands for failing to include the need to use a cane and the need to avoid working around workplace hazards due to falls. [Filing No. 8-2 at 27.] Mr. Bumgardner fails to articulate what if any further limitations should have been included in the ALJ's RFC finding based on the evidence he cites. The deficiency is striking. The presence of medical conditions, examination findings, test results and symptoms are of limited import to the overall decision beyond Step Three other than to the degree to which they result in functional limitations in the claimant's RFC. The Seventh Circuit in *Davis* recently noted the potential consequence of a plaintiff's failure to articulate functional impact:

> Davis also argues that the ALJ erred by not including any limitations regarding fibromyalgia in the RFC, but Davis waived this challenge by not developing it in her brief. She does not explain how the ALJ's RFC finding is incompatible with her fibromyalgia symptoms, nor does she suggest what limitations should have been included. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (explaining that a diagnosed medical condition does not necessarily establish decreased capacity to work).

*Davis v. Berryhill*, 2018 WL 367808 at *4 (7th Cir. Jan. 11, 2018) (unpublished). Potential of waiver aside, the court again will give Mr. Bumgardner the full benefit of the doubt in reaching his specific arguments to the degree the court can decipher their implications.

## 1. Dr. Wessel's Opinion

Mr. Bumgardner argues that the ALJ should have given great weight to his primary care physician, Dr. Wessel's "medical opinion and observations" due to his long treatment history with that provider. [Filing No. 12 at 12 (citing 20 C.F.R. § 404.1527(c)(2)).] Mr. Bumgardner further contends that while the ALJ acknowledged Dr. Wessel's opinion and stated that he declined to give it weight that "the ALJ did not make any analysis necessary to discredit Dr. Wessel's *medical* opinions, only his opinions concerning the ultimate decision as to whether [Mr.] Bumgardner was disabled under the Social Security Act, a determination that is reserved for the Commissioner." [Filing No. 12 at 12 (emphasis in original) (citing 20 C.F.R. § 404.1527(d)).] Mr. Bumgardner also states "because there is nothing within the decision to overcome Dr. Wessel's medical opinions, Dr. Wessel's observations regarding Bumgardner's gait, which occurred on November 7, 2013, or approximately one month after the discredited opinion, should be given greater weight than that given by the ALJ." [Filing No. 12 at 12.] Finally, Mr. Bumgardner argues that "controlling weight should have been given to both Dr. Wessel's observations and opinions." [Filing No. 12 at 12.]

Mr. Bumgardner's argument invokes the treating physician rule. In *Scott,* the Court described that "[a] treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (*See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010)). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Id.* (citing *Martinez v.*

*Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306).  "And even if there had been sound reasons for refusing to give [a treating physician's] assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit."  *Id.* at 740 (*See Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010)).  "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."  *Id.* (*See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)).

Turning to the ALJ's decision, the ALJ stated in relevant part:

As for the opinion evidence, when Dr. Wessel saw the claimant on October 29, 2013, he reported that he did not feel the claimant was able to work due to significant pain that was limiting his ability to move and work and due to his significant stress.  However, Dr. Wessel also reported that he needed to rule out malingering versus conversion disorder versus significant anxiety/depression (Exhibit 14F/16).  The undersigned does not give weight to this assessment. By merely stating that the claimant could not work, Dr. Wessel did not give a function-by-function analysis of the claimant's limitations.  In addition, there is nothing in the record indicating that Dr. Wessel has the necessary knowledge and expertise of the labor market such as to qualify him to give an expert opinion on the claimant's employability.  Finally, the question of whether the claimant can work, that is, whether the claimant is disabled, is a question that is reserved for the Commissioner.

[Filing No. 8-2 at 26 (citing Filing No. 8-23 at 16).]  As Mr. Bumgardner alludes to, Dr. Wessel's opinion includes not only a conclusion that he is unable to work, but also a

judgment as to why, due to "his sig[nificant] pain that is limiting his ability to move and work and also [due to] his sig[nificant] stress."[7] [Filing No. 8-23 at 17.]

As to whether the ALJ should have given the opinion controlling weight, the court finds that the opinion is not well supported and is otherwise inconsistent with other substantial evidence of record. On the day of the visit that Dr. Wessel gave his opinion, October 29, 2013, Mr. Bumgardner alleged serious symptoms that he starts "shaking and vomiting" whenever "he tells someone what [is] going on with his health." [Filing No. 8-23 at 16.] Dr. Wessel observed that Mr. Bumgardner was "very slow in ambulation and had sig[nificant] trouble getting up on the exam table, took approx[imately] 3 min[utes] to stand from chair." [Filing No. 8-23 at 16.] In the context of the complaints and observations, it would appear that there was support for Dr. Wessel's opinion. However, the opinion is seriously undermined by Dr. Wessel's other contemporaneous notes reflecting the basis of his opinion, that he "personally spent about 15 minutes in direct discussion with [Dr. Wellinghoff] this [AM] who agreed to see the patient and agreed with my assessment that his [symptoms] are most suggestive of worsening anxiety/depression and not a medical cause, his extensive recent med[ical] [work-up] was reviewed again in office today by myself." [Filing No. 8-23 at 17.] In fact, Dr. Wessel's diagnostic conclusions are fairly illuminating, "Need to [rule out] *malingering* versus conversion

---

[7] The regulations make clear that the conclusory aspect of Dr. Wessel's statement that Mr. Bumgardner is unable to work is an issue reserved to the Commissioner and is not considered a medical opinion at all. 20 C.F.R. § 404.1527(d)(1)-(2). Furthermore, the Commissioner correctly points out that controlling weight can never be given to these types of conclusions. [Filing No. 18 at 19.]

[disorder] versus sig[nificant] anxiety/depression."[8]   [Filing No. 8-23 at 17 (emphasis added).]  The court finds it significant that Dr. Wessel was not convinced at the time he rendered the opinion that Mr. Bumgardner's symptoms had any physical cause, despite an extensive work-up, or that Mr. Bumgardner was not faking the symptoms for purposes of secondary gain.  Dr. Wessel's opinion is not internally consistent within the regulatory scheme for determining disability that requires symptoms to be attributed to an established impairment.  The court finds, given the full context of Dr. Wessel's opinion, that controlling weight was not appropriate.

However, the court must also evaluate the weight the opinion was given and the reasons the ALJ provided for the weight.  The court does not agree with Mr. Bumgardner that the ALJ did not give *any* analysis as to why he declined to give Dr. Wessel's opinion weight, beyond the portion reserved to the Commissioner.  The ALJ specifically cited the rule out diagnosis offered of malingering.  Again, the diagnosis is of particular importance in evaluating the "supportability" of the opinion, despite an extensive work-up and long standing treatment relationship, Dr. Wessel had found no physical cause for Mr. Bumgardner's symptoms and was still trying to determine if he was faking them.  *See* 20 C.F.R. § 404.1527(c)(3).  Moreover, the ALJ noted the lack of functional limitations

---

[8] The court predominantly is analyzing Dr. Wessel's opinion that Mr. Bumgardner could not work due to pain and limited mobility, rather than stress.  While Dr. Wessel offers an opinion as to both physical and mental causes, he is not a mental health specialist, apparent from his need to consult with one. Mr. Bumgardner did not present significant allegations of mental health symptoms either at his hearing or in this suit, focusing almost exclusively on physical issues.  The ALJ gave weight to a reviewing specialist as to Mr. Bumgardner's mental health functioning and Mr. Bumgardner does not challenge that determination or the ALJ's "paragraph B" findings.

expressed in the opinion, which is not strictly required by the regulations but relevant to evaluation of medical opinions generally.  *See* 20 C.F.R. § 404.1527(a)(1).  The ALJ also noted that there was no evidence that Dr. Wessel had the requisite vocational expertise to render an opinion on employability, which the court does not find particularly persuasive, but is again relevant.  *See Alvarado v. Colvin,* 836 F.3d 744, 748-49 (citing *Loveless,* 810 F.3d at 507 (7th Cir. 2016) (whether claimant can perform jobs in the economy is a question for the Administration not medical experts)).  Taken together, the court is satisfied that the ALJ provided good reasons for declining to give weight to the opinion of Dr. Wessel.

Lastly, Mr. Bumgardner's argument that the ALJ's observations regarding his gait on November 7, 2013, should have been given greater weight by the ALJ is not well taken by the court.  In order to be a medical opinion at all under the regulations, statements from acceptable medical sources must "reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions."  20 C.F.R. § 404.1527(a)(1).  An observation, like a gait analysis, stretches the definition of a "judgment" about symptoms.  Realizing that Circuit precedent has generally construed medical opinions rather liberally as to their particular form, this court will consider Mr. Bumgardner's characterization *arguendo*.

However, the analysis would be almost identical to the statement of Dr. Wessel above.  The ALJ "need not provide a written evaluation of every piece of evidence that is presented."  *Steward v. Bowen,* 858 F.2d 1295, 1299 (7th Cir. 1988).  The ALJ is not required to address every piece of evidence in each section of his decision nor repeat the

factual analysis throughout each section. *Rice*, 384 F.3d at 370 n.5 (7th Cir. 2004) ("it is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses"). Again, the contemporaneous notes of Dr. Wessel on the date of the visit, November 7, 2013, are noteworthy. Dr. Wessel continued to consider the possibility of malingering, [Filing No. 8-26 at 20], noted that Mr. Bumgardner had brought in short term disability paperwork with him, and advised him "to do more around the house, to get up and walk, help with tasks, get more active, laying around like he is doing is not helping his depression and is likely making things worse," [Filing No. 8-26 at 21.] Given Dr. Wessel's advice, the court is not persuaded that he was offering an opinion that Mr. Bumgardner was more limited by his gait than the ALJ credited, which again limited his standing and walking considerably in his RFC. In the very next visit, Dr. Wessel noted of Mr. Bumgardner that "over past week feeling better overall," "feeling more like himself," "doing more around the house," had "shooting pain worse with prolonged standing," [Filing No. 8-26 at 21], "appears to be improving clinically," [Filing No. 8-26 at 22.] On November 20, 2013, Dr. Wessel noted that Mr. Bumgardner "[m]ay return to light duty tomorrow" and "[f]ull duty on Monday." [Filing No. 8-26 at 24.] Given the context, it does not appear to what degree the gait analysis is a medical opinion meant to limit Mr. Bumgardner's ability to work either long term or in conflict with the ALJ's fairly restrictive RFC for sedentary work. The court finds that the ALJ was not required to give any particular weight to the observation.

## 2. Dr. Tapal's Observation

Mr. Bumgardner argues that the ALJ "improperly weighed Dr. Tapal's observations and opinion on matters outside his area of expertise" and "improperly gave Dr. Tapal controlling weight regarding [Mr.] Bumgardner's neuropathy and foot drop along with his ability to ambulate effectively." [Filing No. 12 at 12 (citing Filing No. 8-2 at 26).]

The Commissioner notes that it "is unclear why [Mr. Bumgardner] thinks the ALJ gave 'controlling weight' to Dr. Tapal's observations about his neuropathy and ability to ambulate because the doctor did not issue an opinion. Rather, Dr. Tapal noted that [Mr. Bumgardner's] 'hips, knees, and ankles moved normally.'" [Filing No. 18 at 20.]

The court agrees with the Commissioner that Dr. Tapal did not give a medical opinion by recording examination findings and even if he did the ALJ never assigned the opinion any weight in the decision, let alone gave it controlling weight. The ALJ did cite to the observation to support his conclusion that "neuritis and foot drop of the feet" were not "disabling as in October 2015, Dr. Tapal noted that the claimant's hips, knees, and ankles moved normally." [Filing No. 8-2 at 26.] However, the ALJ goes on to state that the RFC "addresses this issue by restricting the claimant to standing and/or walking for no more than two hours in an eight-hour day." [Filing No. 8-2 at 26.] Irrespective of the ALJ's treatment of the observation, he gave Mr. Bumgardner the benefit of the doubt that his drop foot would be limiting. Mr. Bumgardner does not present any additional restrictions here than what the ALJ accommodates in the RFC as to standing and walking and did not pose any additional restrictions in a hypothetical question to the VE. [*See*

Filing No. 8-2 at 71.]  The court finds no error with regard to the ALJ's treatment of Dr. Tapal's observation.

### 3. Dr. Denton's Observation

Mr. Bumgardner argues that the ALJ should have given controlling weight "particularly to the opinions of [Mr.] Bumgardner's podiatrist, Dr. Denton who also noted [Mr.] Bumgardner's neuropathy and foot drop."  [Filing No. 12 at 12.]  Mr. Bumgardner does not cite to any specific opinion(s) given by Dr. Denton at this point in his brief. However, he refers several times to Dr. Denton's January 27, 2015, physical examination that includes:

> Musculoskeletal: Pronated foot type bilateral. Patient has decreased dorsiflexion bilateral consistent with a history of drop foot. Patient does have decreased muscle strength bilateral. Adequate range of motion to the ankle and subtalar joint without pain or crepitus. There is some pain to palpation of the insertion of the plantar fascia bilateral left greater than right extending to the medial band of the plantar fascia to the arch.

[Filing No. 8-28 at 13.]

The court does not find error in the ALJ's treatment of this observation.  Again, an observation is not really a judgment at all.  However, even if it were a medical opinion, the ALJ would not have been required to give the opinion controlling weight.  As detailed throughout this entry, there is conflicting evidence about Mr. Bumgardner's gait and ability to ambulate.  Even if the observation were given controlling weight, the court does not understand the import on the decision.  Dr. Denton diagnosed only plantar fasciitis and neuritis along with the examination and a history of bilateral drop foot and Wegener's Granulomatosis.  [Filing No. 8-28 at 13.]  Mr. Bumgardner admits Dr. Denton also noted

improvement with his drop foot.[9]   [Filing No. 8-28 at 14.]   Mr. Bumgardner has not

explained in any way the significance of the observation or how it would have affected any

of the ALJ's findings, making any error that could be imagined harmless.

### 4. Mr. Bumgardner's Testimony

Mr. Bumgardner's sole attempt to explain the significance of the ALJ's treatment

of his neuropathy and drop foot is to say that the ALJ's RFC finding that he could stand

and walk for two hours is contradicted by his testimony and medical evidence that he can

"stand for approximately 15-20 minutes before he has to sit and rest."  [Filing No. 12 at

13.]  For starters, the ALJ did not give full weight to Mr. Bumgardner's testimony and his

credibility determination is discussed above.  Second, Mr. Bumgardner does not cite to any

medical opinion that obviously contradicts the ALJ's RFC finding.  Lastly, the testimony

itself does not obviously contradict the RFC finding that he could stand and walk for two

hours in an eight hour day.  Mr. Bumgardner testified he could stand for "maybe 15

minutes."  [Filing No. 8-2 at 48.]  His full testimony on walking was that he could walk

100 feet and when asked how long he needs to rest before he can keep walking was "just a

couple minutes."  [Filing No. 8-2 at 54.]  Someone that stands for 15 minute increments

---

[9] Mr. Bumgardner's arguments about the weight that should have been given a November 7, 2013, gait analysis and a January 27, 2015, examination by Dr. Denton are particularly undermined by his own Functional Statement April 10, 2014, that he could walk 100 yards before needing to rest for 15 minutes, [Filing No. 8-6 at 32] and evidence his drop foot improved.  His further claim that his condition deteriorated significantly is also seriously undermined by the same evidence; the conflicting evidence supports that any of the ALJ's conflicting findings are supported by substantial evidence.

and walks 100 feet before needing to rest a couple minutes and then resumes walking could conceivably stand and walk for a total of two hours in an eight hour day.

### 5. Ms. Bumgardner's Functional Report

Mr. Bumgardner also argues that the ALJ improperly rejected his wife's statements in a Functional Report given on April 10, 2014, [Filing No. 8-6 at 25], the same day she prepared his Functional Report, [Filing No. 8-6 at 34], that corroborate his testimony, in particular that he can only stand ten minutes before tiring, [Filing No. 8-6 at 20].

The ALJ noted Mrs. Bumgardner's Functional Report and declined to give "significant weight to this assessment because the claimant's spouse did not observe the claimant in a professional capacity (SSR 06-3p), and because the opinion is not supported by the evidence of record discussed above. The opinions discussed above have all been considered pursuant to SSR 06-3p."

The ALJ's explanation was adequate. The ALJ had already provided a lengthy analysis of the medical evidence of record at that point in the decision and provided an analysis as to why he deemed Mr. Bumgardner to be less than fully credible. The ALJ is not required to repeat substantially similar analysis in the decision and the court reads the decision as a whole. Also SSR 06-03p makes it clear that reports from "other sources" are more persuasive when given by a source that observes the claimant in their professional capacity. SSR 06-03p. The ruling also addresses the explanation that needs to be given these opinions:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to

opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* Here, it's not even clear to the court what impact a statement that Mr. Bumgardner could only stand for ten minutes would have on his ability to perform sedentary work and he does not develop that here, nor did he develop that during the hearing with VE testimony. Moreover, the court is able to adequately follow the ALJ's reasoning and similar explanations have been found to be sufficient for rejecting even medical source opinions that are generally given more deference. *See Filis v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012). The court does not find the ALJ's rejection of Mrs. Bumgardner's Functional Report to be improper when reading the decision as a whole.

### 6. Remaining Arguments on Functional Limitations

Mr. Bumgardner makes several other arguments that functional limitations were not included in the decision that were supported by the record, including the use of his upper extremities, [Filing No. 12 at 14], off-task behavior, [Filing No. 12 at 16], fatigue, [Filing No. 16 at 18], and absences, [Filing No. 12 at 17]. None of these arguments have any substance, predominately because Mr. Bumgardner does not adequately articulate the actual functional impact or provide any supportive medical opinions for his contentions.

With the use of his upper extremities, Mr. Bumgardner again cites his own testimony for support, which was not fully credited. The medical evidence he does cite shows some issues with their use and treatment for his conditions. However, he fails to

explain how the ALJ's RFC does not adequately account for them by limiting manipulative functions to frequently and overhead reaching to occasionally. [Filing No. 8-2 at 22.]

As to off-task behavior, the ALJ credited that Mr. Bumgardner would need a rest of 10-15 minutes after working for a two hour segment. [Filing No. 8-2 at 22.] The ALJ included this limitation in a hypothetical to the VE and the VE testified that the jobs found at Step Five could be performed with the limitation. [Filing No. 8-2 at 70.] Mr. Bumgardner has not provided any persuasive evidence, including a medical opinion, that would support any greater restriction was warranted or that the ALJ's finding was not supported by substantial evidence.

Mr. Bumgardner's argument that the ALJ should have included fatigue as a severe impairment is without merit. First, fatigue is a symptom, not a medical condition. Mr. Bumgardner cites evidence that shows he has anemia to support that fatigue should have been a severe impairment. However, the ALJ included anemia as a severe impairment. [Filing No. 8-2 at 16.] Mr. Bumgardner does argue that his anemia met or equaled a listing or challenge to the ALJ's contrary finding but he does not develop what functional impact is supported by his fatigue. Moreover, the ALJ credited his fatigue by including rest breaks in his RFC as noted above. [Filing No. 8-2 at 28.]

As to absences, again Mr. Bumgardner provides no support for greater restrictions beyond the RFC other than his own testimony that was not fully credited.

# IV.
## CONCLUSION

"The standard for disability claims under the Social Security Act is stringent." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Id*. at 274. Taken together, the court can find no legal basis presented by Mr. Bumgardner to reverse the ALJ's decision that he was not disabled during the relevant time period. Therefore, the decision below is **AFFIRMED**. Final judgment will issue accordingly.

**SO ORDERED** this 9th day of February 2018.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.